## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

|  |  |
|---|---|
| MARTIN J. BENTLER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EXXON MOBIL CORPORATION, DARREN W. WOODS, ANDREW P. SWIGER, DAVID S. ROSENTHAL, NEIL A. CHAPMAN, JACK P. WILLIAMS, LIAM M. MALLON, NEIL A. HANSEN, and JEFFREY J. WOODBURY,<br><br>Defendants. | Case No. _____<br><br><br><br>**JURY TRIAL DEMANDED** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Martin J. Bentler ("Plaintiff") alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, including the investigation of Plaintiff's counsel, which included, among other things, a review of Defendants' (defined below) United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by Exxon Mobil Corporation ("Exxon" or the "Company"), analyst reports and advisories about the Company, media reports concerning the Company, judicial filings and opinions, and other publicly available information.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     <u>NATURE OF THE ACTION AND OVERVIEW</u>

1.      This is a federal class action on behalf of a class of all persons and entities who purchased or otherwise acquired Exxon securities between February 28, 2018, and January 14,

2021, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Exxon, a New Jersey corporation with principal executive offices in Irving, Texas, is one of the world's largest oil and gas companies.  Exxon operates through three business segments: (1) Upstream, through which Exxon explores for and produces crude oil and natural gas; (2) Downstream, through which Exxon manufactures and sells petroleum products; and (3) Chemical, through which Exxon manufactures and sells petrochemicals.

3.      Exxon's energy holdings include substantial acreage in the Permian Basin, a large oil-and-gas producing area in the southwestern United States.  Throughout the Class Period, Defendants made repeated positive representations about the quality and potential of the Company's Permian Basin assets, assuring investors that Exxon was equipped to maximize the value of its holdings in the Permian Basin and to dramatically and quickly increase production there.

4.      The truth about Exxon's false and misleading statements began to emerge on September 13, 2020, when *The Wall Street Journal* reported that certain Exxon employees had complained to management that the Company's $60 billion valuation of its assets in the Delaware Basin (a subregion of the Permian Basin) was inflated by $20 billion.  According to *The Wall Street Journal*, the objecting employees questioned the Company's aggressive production plan, finding it "overly optimistic" because "Exxon was overestimating how quickly it could drill" in the Permian Basin.  On this news, the price of Exxon common stock declined $0.24 per share, to close at $36.66 per share on September 14, 2020.

5.      Additional corrective information surfaced on January 15, 2021, when *The Wall Street Journal* reported that the SEC had launched an investigation into the Company following

the filing of a whistleblower complaint regarding Defendants' overvaluation of the Company's Permian Basin assets. *The Wall Street Journal* explained that the whistleblower complaint—which was not yet public—alleged that "[s]everal people involved in valuing a key asset in the Permian Basin . . . complained during an internal assessment in 2019 that employees were being forced to use unrealistic assumptions about how quickly the company could drill wells there to arrive at a higher value." According to the report, the whistleblower alleged that drilling delays in the Permian Basin materialized as early as 2018—even *before* Defendants announced the Company's most recent aggressive production plans. In response to news of the SEC investigation, the price of Exxon common stock fell $2.42 per share, or approximately 5%, to close at $47.89 per share on January 15, 2021.

6.     This Complaint alleges that, throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts, about the Company's business and operations. Specifically, Defendants misrepresented and/or failed to disclose that: (1) the Company had overstated the value of its assets in the Permian Basin by at least $10 billion to $20 billion; (2) the Company's aggressive production goals in the Permian Basin were unrealistic and overly optimistic; (3) the Company therefore faced an increased risk of heightened regulatory scrutiny; (4) the Company lacked effective internal control over financial reporting; and (5) as a result of the foregoing, Defendants' statements about the Company's Permian Basin assets lacked a reasonable basis.

7.     As a result of Defendants' wrongful acts and omissions, and the resulting declines in the market value of Exxon securities, Plaintiff and other members of the Class have suffered significant damages.

## II.   <u>JURISDICTION AND VENUE</u>

8.     Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

9.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Exxon is headquartered in this District, Defendants conduct business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.

11.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   <u>PARTIES</u>

12.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Exxon common stock at artificially inflated prices during the Class Period and has been damaged thereby.

13.     Defendant Exxon is a New Jersey corporation with its principal executive offices located at 5959 Las Colinas Boulevard, Irving, Texas 75039.  Exxon common stock trades on the New York Stock Exchange under the ticker symbol "XOM."

14.     Defendant Darren W. Woods ("Woods") is, and was throughout the Class Period, the Company's Chief Executive Officer and Chairman.

15.     Defendant Andrew P. Swiger ("Swiger") is, and was throughout the Class Period, the Company's Senior Vice President and Principal Financial Officer.

16.     Defendant David S. Rosenthal ("Rosenthal") is, and was throughout the Class Period, the Company's Vice President, Controller, and Principal Accounting Officer.

17.     Defendant Neil A. Chapman ("Chapman") is, and was throughout the Class Period, a Senior Vice President of the Company.

18.     Defendant Jack P. Williams ("Williams") is, and was throughout the Class Period, a Senior Vice President of the Company.

19.     Defendant Liam M. Mallon ("Mallon") has served as President of ExxonMobil Upstream Oil & Gas Company and Vice President of the Company since April 2019.  Prior to April 2019, Defendant Mallon was President of ExxonMobil Development Company.

20.     Defendant Neil A. Hansen ("Hansen") has served as the Company's Vice President of Fuels for Europe, Africa, and the Middle East since February 2020.  From July 2018 until February 2020, Defendant Hansen was the Company's Vice President of Investor Relations and Secretary.  Prior to July 2018, Defendant Hansen was the Company's Downstream Controller.

21.     Defendant Jeffrey J. Woodbury ("Woodbury") was the Company's Vice President of Investor Relations and Secretary until his retirement in July 2018.

22.     Defendants Woods, Swiger, Rosenthal, Chapman, Williams, Mallon, Hansen, and Woodbury are collectively referred to herein as the "Individual Defendants."

23.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Exxon's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market.  Each Individual Defendant was provided with copies of the Company's reports and

5

press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the

ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their

positions and access to material non-public information available to them, each of the Individual

Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were

being concealed from, the public, and that the positive representations that were being made were

then materially false and/or misleading.

24.     Exxon and the Individual Defendants are collectively referred to herein as

"Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

25.     Throughout the Class Period, Exxon was engaged in the development, acquisition,

and exploration of oil and natural gas resources in the United States and worldwide.  Exxon's

energy holdings include substantial acreage in the Permian Basin, a large oil-and-gas producing

area in the southwestern United States.

26.     In 2017, Exxon doubled its Permian Basin oil resources through the acquisition of

companies that held approximately 250,000 acres of leasehold in the region—primarily in the

Delaware Basin, a subregion of the Permian Basin reserve—with an estimated 3.4 billion barrels

of oil equivalent (the "2017 Acquisition").  In announcing the 2017 Acquisition, Exxon stated that

the "investment gives [Exxon] an exceptional Delaware Basin position in a proven multi-stacked

play that can generate attractive returns in a low-price environment."

### B.     Defendants' False and Misleading Statements

27.     The Class Period begins on February 28, 2018, to coincide with the filing of

Exxon's annual report for the year ended December 31, 2017, with the SEC on Form 10-K (the

"2017 Annual Report").   In its 2017 Annual Report, the Company reported that it had approximately $348.7 billion in total assets as of December 31, 2017.

28.   The 2017 Annual Report also reported asset impairments of $521 million in the Company's U.S. Upstream segment, and represented that the Company "has a robust process to monitor for indicators of potential impairment across its asset groups throughout the year."

29.   Regarding the Company's internal control over financial reporting, the 2017 Annual Report stated:

> **Management's Report on Internal Control Over Financial Reporting**
>
> Management, including the Corporation's Chief Executive Officer, Principal Financial Officer and Principal Accounting Officer, is responsible for establishing and maintaining adequate internal control over the Corporation's financial reporting.   Management conducted an evaluation of the effectiveness of internal control over financial reporting based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.   Based on this evaluation, management concluded that Exxon Mobil Corporation's internal control over financial reporting was effective as of December 31, 2017.

30.   As required by the Sarbanes-Oxley Act of 2002, Defendants Woods, Swiger, and Rosenthal certified that the 2017 Annual Report "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

31.   On March 7, 2018, Defendants announced an "aggressive growth strategy to more than double earnings and cash flow from operations by 2025."   Specifically, Defendants represented:

> The company plans to increase tight-oil production five-fold from the U.S. Permian Basin and start up 25 projects worldwide.   Those

startups will add volumes of more than 1 million oil-equivalent barrels per day.  In LNG, the company expects to bring on new production to meet a projected increase in global demand.

Upstream growth will benefit from ExxonMobil's industry-leading exploration success and strategic acquisitions.  In 2017 alone, the company added 10 billion oil-equivalent barrels to its resource base in locations including the Permian, Guyana, Mozambique, Papua New Guinea and Brazil.

Key drivers of growth are in . . . the Permian, where the company has increased the size of its resource to 9.5 billion oil-equivalent barrels from less than 3 billion in the past year.

Through its acquisition of several Bass entities in 2017, ExxonMobil added an estimated resource of 5.4 billion oil-equivalent barrels in the Permian.  The original resource estimate of 3.4 billion barrels at the time of the purchase was increased through technical evaluation and successful delineation in the Delaware Basin, reducing the acquisition cost to just above $1 per oil-equivalent barrel.

The contiguous stacked pays from the New Mexico acquisition are now estimated to provide more than 4,800 drilling locations with an average lateral length of more than 12,000 feet, enabling capital-efficient execution of Permian volumes growth and the potential to further increase future volumes.

32.     Defendants continued to tout the Company's plans for the Permian Basin during a meeting with analysts later that same day.  For example, Defendant Chapman assured investors that "[t]he Permian is clearly a terrific resource" and that Exxon has "a truly unique position in getting value out of the Permian versus anybody else in the industry."   Chapman further represented that the Company expected "to be at $6 billion additional earnings . . . without a price change by 2025, of which $2-additional billion will come from our Refining and Chemical business," including "refining and chemicals out of the Permian," and that "the main driver" of the Company's earnings goals was "to grow liquids" production in the Permian Basin and elsewhere.  Similarly, Defendant Williams stated that "the well quality that's underpinning those

8

growth plans is very, very high quality" and was "the heart of the Permian . . . and it results in some very good financial metrics."

33.     On April 27, 2018, Defendants announced the Company's quarterly financial results, touting first quarter 2018 earnings of $4.7 billion, a year-over-year increase of 16%. Defendants also stated that first quarter 2018 "[b]usiness [h]ighlights" included continued development of Company assets in the Permian Basin, where the Company then possessed twenty-seven operated rigs.

34.     During the Company's quarterly earnings call that same day, Defendants further reported that quarterly capital expenditures were $4.9 billion—up 17% year-over-year—"resulting [from] increased activity in the Permian." Additionally, in response to an analyst's question regarding the Company's strategy in the Permian Basin, Defendant Woodbury stated that the Company had "positioned, not only the logistics network, but also the supply chain" to "maximize[e] the value proposition" of Exxon's Permian Basin assets.

35.     Defendants continued to assure investors that the Company was prepared to quickly maximize the value of its Permian Basin assets. For example, during an earnings call on July 27, 2018, Defendant Chapman stated that the Company "executed multiple contracts that will enhance pipeline capacity from the Permian to the Gulf Coast," had "more than secured liquids evacuation capacity to support growth through 2022," and had "no concerns about evacuation capacity, both in gas and liquids for our Permian business." Chapman also represented that the "biggest growth" the Company was seeing "in terms of liquids" was "what's happening in the Permian," and that the Company "would anticipate seeing the results of" its investment in the Permian Basin "in the coming years." Additionally, when an analyst questioned when the Company's Permian Basin assets would "become[] more of a value-add or a cash flow provider as opposed to a cash flow

consumer," Chapman stated that the Company would "have cumulative cash flow . . . of over, I believe, $5 billion between '18 and 2025," and that the Company was "on plan" to meet or exceed that goal.

36. Similarly, during an earnings call on November 2, 2018, Defendant Hansen stated that the Company was both "ramp[ing] up drilling activities in the Permian" and "maximizing the value from our integrated midstream and manufacturing operations."  Additionally, Defendant Williams stated:

> We are positioned well in the Permian across the full value chain.  It starts with the upstream position, where we continue to see positive indicators on both the quality and the size of the resource in the Northern Delaware basin acreage.  You can see on the chart on the left that we're making good progress versus the growth potential communicated back in March.  Our XTO Permian team is very excited with the results they're seeing out there in this new acreage, and the vector is clearly up on the Permian developments.

37. Moreover, in response to an analyst's concerns that the Company's well completion pace was "still pretty light" in the Permian Basin, Defendant Williams represented:

> We've brought on 58 wells in the Midland Basin, and only 8 in the Delaware Basin, in the third quarter.  And you'll notice the rigs are about equal between the 2 basins.  And what you're seeing is that, in the Midland Basin, there's a lot more infrastructure.  We had the rigs there longer, and so the timing just worked out to where we have a lot more wells coming online there than the Delaware Basin.  Over time, some of that is going to switch over -- some of that growth is going to switch over to the Delaware Basin.  But it's just less mature.  I think it points out the issue that I think Neil Chapman said a couple of times, and I'll say it as well, it's going to be pretty lumpy, coming on.  I mean, we are basically doing 3 things.  Our teams out in the Permian doing 3 things simultaneously: first, we're delineating this big new acreage position we have, and like I said, everybody -- that looks very promising.  There is further upward vector on that resource.  We already increased it from 3 billion to 5 billion barrels, and there's further upward tailwinds on that.  We're building out infrastructure in Delaware Basin.  We're spending a lot of time and energy on this infrastructure buildout.  There's about 200,000 barrels a day of well pad facilities under construction right now in

addition to 2 major central processing facilities. So because we had essentially a blank canvas on this 225,000 acres, there was not a lot of facilities out there. So we're building all that from scratch, which in some respect, is an advantage for us because it allows us to bring other parts of our corporation, this major project expertise, to bear on this. And we're going to wind up with an infrastructure there that's really unlike anything else in the Delaware Basin or in the Midland Basin for that matter or any other unconventional development that I've ever seen. It's going to be very capital efficient, and allow us, long-term, to have a very competitively-advantaged operation.

38.     During an earnings call on February 1, 2019, Defendant Woods similarly stated that the Company "continue[s] to expand and accelerate [development] activities" in the Permian Basin, and added that as the Company had "optimized [its] development with further drilling and delineation," it had begun to "see additional upside well beyond the growth trajectory" Defendants had previously shared.

39.     On February 27, 2019, Defendants filed Exxon's annual report for the year ended December 31, 2018, with the SEC on Form 10-K (the "2018 Annual Report"). In its 2018 Annual Report, the Company reported that it had approximately $346.2 billion in total assets as of December 31, 2018. The Company also stated that its 2018 Upstream spending of $20.2 billion "included growth in the U.S. Permian Basin."

40.     The 2018 Annual Report also reported asset impairments of $297 million in the Company's U.S. Upstream segment, and again represented that the Company "has a robust process to monitor for indicators of potential impairment across its asset groups throughout the year."

41.     Regarding the Company's internal control over financial reporting, the 2018 Annual Report stated:

**Management's Report on Internal Control Over Financial Reporting**

Management, including the Corporation's Chief Executive Officer, Principal Financial Officer and Principal Accounting Officer, is

> responsible for establishing and maintaining adequate internal
> control over the Corporation's financial reporting. Management
> conducted an evaluation of the effectiveness of internal control over
> financial reporting based on criteria established in *Internal
> Control – Integrated Framework (2013)* issued by the Committee of
> Sponsoring Organizations of the Treadway Commission. Based on
> this evaluation, management concluded that Exxon Mobil
> Corporation's internal control over financial reporting was effective
> as of December 31, 2018.

42.     As required by the Sarbanes-Oxley Act of 2002, Defendants Woods, Swiger, and

Rosenthal certified that the 2018 Annual Report "fully complies with the requirements of section

13(a) or 15(d) of the Securities Exchange Act of 1934," and that "the information contained in the

Report fairly presents, in all material respects, the financial condition and results of operations of

the Company."

43.     On March 5, 2019, Defendants announced that the Company had "revised its

Permian Basin growth plans to produce more than 1 million oil-equivalent barrels per day by as

early as 2024." This updated plan represented nearly 80% more production than the Company had

previously projected, and included "[i]ncreased spending to generate double-digit returns at low

prices." Defendants further stated:

> The size of the company's resource base in the Permian is
> approximately 10 billion oil-equivalent barrels and is likely to grow
> further as analysis and development activities continue.
>
> "We're increasingly confident about our Permian growth strategy
> due to our unique development plans," said Neil Chapman,
> ExxonMobil senior vice president. "We will leverage our large,
> contiguous acreage position, our improved understanding of the
> resource and the full range of ExxonMobil's capabilities in
> executing major projects."
>
> "Our plans are attractive at a range of prices and we expect them to
> drive more value as we continue to lower our development and
> production costs," Chapman said.
>
> ExxonMobil's investments in the Permian Basin are expected to
> produce double-digit returns, even at low oil prices. At a $35 per

barrel oil price, for example, Permian production will have an average return of more than 10 percent.

The anticipated increase in production will be supported by further evaluation of ExxonMobil's Delaware Basin's increased resource size, infrastructure development plans, and secured capacity to transport oil and gas to ExxonMobil's Gulf Coast refineries and petrochemical operations through the Wink-to-Webster, Permian Highway and Double E pipelines.

Among the company's key advantages in the Permian, is its acreage position. The company has large, contiguous acreage that enables multi-well pads in large development corridors connecting to efficient gathering systems, reducing development costs and accelerating production growth. ExxonMobil's scale, financial capacity and technical capabilities enable the company to maximize the value of the resource.

ExxonMobil is actively building infrastructure to support volume growth. Plans include construction at 30 sites to enhance oil and gas processing, water handling and ensure takeaway capacity from the basin. Construction activities include central delivery facilities designed to handle up to 600,000 barrels of oil and 1 billion cubic feet of gas per day and enhanced water-handling capacity through 350 miles of already-constructed pipeline.

"These investments support growth plans and ensure that as production levels continue to rise, we are well positioned in processing and transportation capacity," Chapman said.

44.    The following day, on March 6, 2019, Defendants announced that the Company had also updated its earnings projections because Exxon was "exceeding the pace of [its] expected progress on the aggressive growth strategy [Defendants] laid out last year." Specifically, Defendants stated that the Company now expected its 2025 annual earnings potential to increase by more than 140%—up from the previous projection of 135%—as compared to 2017 adjusted earnings. Defendants also reported that the Company's return on capital employed was expected to double by 2025, and pointed to "ExxonMobil's exploration success and progress in development plans" as a key driver of growth.

13

45.     Later that same day, during the Company's annual Investor Day event, Defendant Chapman further represented that Exxon's projected hyperbolic production growth in the Permian Basin would be possible by spending 2018 and 2019 first "putting the infrastructure in place," after which the Company could "unleash the hounds."

46.     Defendants continued to tout the Company's aggressive development projections for the Permian Basin throughout the remainder of 2019.  For example, during an earnings call on April 26, 2019, Defendant Williams reiterated that "the infrastructure piece of [Permian development] is pretty material" to the Company's growth plans.  Defendant Hansen also represented that the Company "remain[ed] on track with plans to increase production in the Permian Basin to 1 million oil equivalent barrels per day by 2024."

47.     Similarly, at a JPMorgan energy conference on June 18, 2019, Defendant Mallon stated that, with respect to the Permian Basin, the Company was "on track to deliver on the 1 million barrels a day by 2024."

48.     Likewise, during a Company earnings call on August 2, 2019, Defendant Hansen represented that the Company "remain[ed] on schedule with plans to increase production in the Permian to 1 million oil-equivalent barrels per day by 2024 as we also continue to build out supporting infrastructure and takeaway capacity."  Defendant Chapman further stated that while production in the Permian Basin would be "lumpy" due to the pace of infrastructure development, he was "very confident that we are going to meet the overall growth rate that we represented."

49.     Additionally, during an earnings call on November 1, 2019, Defendant Hansen stated that "Permian growth remains on track."

50.     Then, during an earnings call on January 31, 2020, an analyst expressed concern that the Company's Permian production had been relatively flat over the preceding quarter and

that the "Delaware [Basin] is not performing as well as you would like on the drilling side." However, Defendant Woods dismissed these concerns by assuring investors that the Company was "making really good progress" in the Delaware Basin and was "clearly on track" to deliver future production volumes in the Permian Basin as projected.

51.     On February 26, 2020, Defendants filed Exxon's annual report for the year ended December 31, 2019, with the SEC on Form 10-K (the "2019 Annual Report").  In its 2019 Annual Report, the Company reported that it had approximately $362.6 billion in total assets as of December 31, 2019.

52.     The 2019 Annual Report also reported asset impairments of $146 million in the Company's U.S. Upstream segment, and again represented that the Company "has a robust process to monitor for indicators of potential impairment across its asset groups throughout the year."

53.     Regarding the Company's internal control over financial reporting, the 2019 Annual Report stated:

> **MANAGEMENT'S REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING**
>
> Management, including the Corporation's Chief Executive Officer, Principal Financial Officer, and Principal Accounting Officer, is responsible for establishing and maintaining adequate internal control over the Corporation's financial reporting.  Management conducted an evaluation of the effectiveness of internal control over financial reporting based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.  Based on this evaluation, management concluded that Exxon Mobil Corporation's internal control over financial reporting was effective as of December 31, 2019.

54.     As required by the Sarbanes-Oxley Act of 2002, Defendants Woods, Swiger, and Rosenthal certified that the 2019 Annual Report "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "the information contained in the

Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

55.     Additionally, during the Company's annual Investor Day on March 5, 2020, Defendant Chapman stated that "for our largest resource, which is in the Delaware Basin, we're only just about to unleash the hounds."

56.     Defendants' statements about the Company's business and operations in the Permian Basin were materially false and/or misleading when made because Defendants misrepresented and/or failed to disclose that: (1) the Company had overstated the value of its assets in the Permian Basin by at least $10 billion to $20 billion; (2) the Company's aggressive production goals in the Permian Basin were unrealistic and overly optimistic; (3) the Company therefore faced an increased risk of heightened regulatory scrutiny; (4) the Company lacked effective internal control over financial reporting; and (5) as a result of the foregoing, Defendants' statements about the Company's Permian Basin assets lacked a reasonable basis.

**C.     The Truth Begins to Emerge**

57.     Investors began to learn the truth about the value of the Company's Permian Basin assets on September 13, 2020, when *The Wall Street Journal* reported:

> Even before the pandemic, some of Exxon's growth plans in Texas were viewed as unrealistic by some workers, according to current and former employees.
>
> In March 2019, Exxon said it would increase oil and gas production in the Permian Basin to 1 million barrels per day as early as 2024, up from previous estimates of 600,000 by 2025.   Some staff assigned to the project thought that was overly optimistic, said six current and former employees.
>
> For one area called the Delaware, some Exxon managers in 2018 had initially pegged the net present value of those holdings at about $60 billion, according to several employees.

> Some involved in the project estimated last summer that the area's net present value was closer to $40 billion because they believed Exxon was overestimating how quickly it could drill, according to the people.  After additional debate and consultation, the value was adjusted to about $50 billion, said the people.

58.     On this news, the price of Exxon common stock declined $0.24 per share, or approximately 1%, from a close of $36.90 per share on September 11, 2020, to close at $36.66 per share on September 14, 2020

59.     Then, on January 15, 2021, *The Wall Street Journal* reported that the SEC had launched an investigation of Exxon after an employee filed a whistleblower complaint in the fall of 2020 alleging that Exxon had overvalued its Permian Basin assets.  Specifically, *The Wall Street Journal* stated:

> Several people involved in valuing a key asset in the Permian Basin, currently the highest-producing U.S. oil filed, complained during an internal assessment in 2019 that employees were being forced to use unrealistic assumptions about how quickly the company could drill wells there to arrive at a higher value, according to a copy of the complaint, which was reviewed by The Wall Street Journal.

> At least one of the employees who complained was fired last year, according to a person familiar with the matter.

> *             *             *

> As the Journal previously reported, Mr. Woods' Permian growth plans dismayed some Exxon employees, who viewed them as unrealistic.

> In March 2019, Mr. Woods said Exxon would increase oil and gas production in the Permian to one million barrels a day as early as 2024, up from previous estimates of 600,000 by 2025.  The new target would amount to roughly 25% of Exxon's overall production before the Covid-19 pandemic.  It hasn't updated its production targets there since announcing budget cuts in November.

> "No one I knew in the organization thought this was possible; the pressure to deliver on Woods's promise to the market permeated the organization," the whistleblower said in the complaint.

\*        \*        \*

> As the Journal previously reported, some Exxon managers in 2018 had initially pegged the net present value of the Delaware Basin at about $60 billion.  But some employees involved in Exxon's annual development planning estimated during the summer of 2019 that the area's net present value was closer to $40 billion.

> According to the whistleblower complaint, the lower estimate reflected, in part, that it took longer than expected to drill wells in 2018.  After employees delivered the new number to the Delaware development manager, she allegedly asked them to "claw back" some of the lost value, according to the complaint, by using different assumptions, including a more optimistic "learning curve" that estimated the rate at which they would improve drilling times.

> Some employees objected to using the new learning curve, which they viewed as unrealistic, and one employee submitted the revised estimates in a file named "This is a Lie," according to the complaint. The development planners ultimately estimated that the net present value was $50 billion.

60.    In response to the news revealing the existence of the SEC investigation, the price of Exxon common stock declined $2.42 per share, or approximately 5%, from a close of $50.31 per share on January 14, 2021, to close at $47.89 per share on January 15, 2021.

## V.    **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

61.    Plaintiff brings this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Exxon securities during the Class Period (the "Class").  Excluded from the Class are Defendants, their agents, directors and officers of Exxon, and their families and affiliates.

62.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

63.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

       a.     Whether Defendants violated the Exchange Act;

       b.     Whether Defendants omitted and/or misrepresented material facts;

       c.     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

       d.     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

       e.     Whether the price of Exxon securities were artificially inflated; and

       f.     The extent of damage sustained by members of the Class and the appropriate measure of damages.

64.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

65.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in securities class actions.  Plaintiff has no interests that conflict with those of the Class.

66.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VI.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

67.     Plaintiff will rely upon the presumption of reliance establish by the fraud-on-the-market doctrine in that, among other things:

a.    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.    The omissions and misrepresentations were material;

c.    The Company's securities traded in an efficient market;

d.    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

e.    Plaintiff and the Class purchased Exxon securities between the time Exxon and the Individual Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

68.    At all relevant times, the market for Exxon securities was efficient because: (1) as a regulated issuer, Exxon filed periodic public reports with the SEC; and (2) Exxon regularly communicated with public investors using established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## VII.  <u>NO SAFE HARBOR</u>

69.    Defendants' "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. Defendants are liable for any false and/or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Exxon who knew that the forward-looking statement was false. None of the historic or present-tense statements made by Defendants were assumptions underlying

or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

70.     Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Plaintiff and the Class.  The price of Exxon securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.  As a result of their purchases of Exxon securities during the Class Period, Plaintiff and the Class suffered economic loss, *i.e.* damages, under the federal securities laws.

## IX.     SCIENTER ALLEGATIONS

71.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of Exxon securities during the Class Period.

## X.      CLAIMS AGAINST DEFENDANTS

### COUNT I

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
against All Defendants**

72.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

73.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and the Class; and (2) cause Plaintiff and the Class to purchase Exxon securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

74.     Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

75.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### against the Individual Defendants

76.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

77.     The Individual Defendants acted as controlling persons of Exxon within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the

Company, including the content and dissemination of the various false and/or misleading statements.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

78.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular accounting practices giving rise to the securities violations as alleged herein, and exercised the same.

79.     As described above, Exxon and the Individual Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable under Section 20(a) of the Exchange Act.  As a direct and proximate result of this wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Exxon securities during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.     Awarding compensatory damages and equitable relief in favor of Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    c.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

    d.      Such other and further relief as the Court may deem just and proper.

## XI.    **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: February 17, 2021                    Respectfully submitted,

**NIX PATTERSON, LLP**

*s/ Karl Rupp*
Bradley Beckworth (TX Bar No. 24001710)
Jeffrey Angelovich (TX Bar No. 00786988)
Susan Whatley (TX Bar No. 24047420)
Karl Rupp (TX Bar No. 24035243)
Cody Hill (TX Bar No. 24095836)
Advancial Building
1845 Woodall Rodgers Freeway
Suite 1050
Dallas, Texas 75201
Telephone: (972) 831-1188
Facsimile: (972) 444-0716
bbeckworth@nixlaw.com
jangelovich@nixlaw.com
swhatley@nixlaw.com
krupp@nixlaw.com
codyhill@nixlaw.com

**KESSLER TOPAZ**
   **MELTZER & CHECK, LLP**
Naumon A. Amjed
Darren J. Check
Ryan T. Degnan
Karissa J. Sauder
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
namjed@ktmc.com
dcheck@ktmc.com
rdegnan@ktmc.com
ksauder@ktmc.com
*Attorneys for Plaintiff Martin J. Bentler*